The next case on the docket is 523-1054 for the appellant, Luis Lagas and for the athlete, John Cranley. Mr. Lagas? Yes, sir. Is that right, Lagas? Yes. If you'd like to begin whenever you're ready. If you'll please, this is the court. Luis Lagas for the appellant, Joshua Toole. Per the case law, preliminary injunction is an extraordinary remedy and should only be granted in extreme emergencies. It is Mr. O'Toole's position that no extreme emergency was present in this case. The subject at issue in our case is one of two partners at odds with each other. The operating agreement places both partners at 50% with one to act as operations manager and one to act as the financial manager. Most contracts contemplate an end to the contract should both partners be at odds, and this operating agreement did not contemplate that. Because of that deficiency, this lawsuit was begun. During the pendency of the litigation, there were disagreements had between both partners, such that Mr. O'Toole was blocked by Mr. Gregory from hiring an employee to replace an integral employee who left, and also blocked from using different systems that were necessary and integral to run the business. Because of those limits, Legacy was forced to close its doors, and based on this closure, Mr. Gregory filed a motion for injunctive relief, asking for 100% control of Legacy, which goes against the operating agreement at issue. Multiple days of evidentiary hearings were had, and following those evidentiary hearings, Judge Carruthers entered an order granting the injunctive relief motion, and expelling my client, Mr. O'Toole, from his primary employment as operations manager, and giving full control of Legacy Jim to Gregory. It is O'Toole's position that Judge Carruthers' granting of this injunctive relief constituted an abuse of discretion by Judge Carruthers. The purpose of injunctive relief is to preserve the status quo, and by expelling Joshua O'Toole from his primary employment as Jim's operations manager, Judge Carruthers, in fact, disrupted the status quo rather than preserving it. The case file in Postma is clear. It is improper to ask, on an interim basis, for the relief that is requested permanently by the parties in their claims or their counterclaims. Both parties... Mr. Nargis, did you file a cross-motion for injunctive relief? No, Your Honor. So, it's a little bit complex because I wasn't the first attorney on the case. So, initially, Marshall Rinder, who was my predecessor representing Mr. O'Toole, he had filed the original complaint and had filed a motion for injunctive relief on an emergency basis, but at that time, I believe that there was a switch in terms of the judges, and so that motion was actually never addressed. I did... You started off your argument by saying that a preliminary injunction did not need to be granted in this case. I mean, if you had your relief requested in this case, wouldn't you want your client to be inserted instead of Mr. Gregory? I don't believe so, Your Honor. Well, I cannot... If that's not true, then how is this corporation going to proceed without falling apart and losing money? Well, so what I had suggested to the court, Your Honor, was that a trustee be appointed by the court such that both parties would need to respond to that trustee and answer that trustee to act on behalf of the best interest of the corporation. And where is the authority of the court to appoint a trustee? I believe I cited to that in my motion, Your Honor. I don't remember off the top of my head. I'm sorry. So, you're here before the appellate court today, and you can't tell us the basis for the relief that you requested. Requesting the appellate court, Your Honor, or... Aren't you asking for equitable relief from this court or from the trial court? Didn't you ask for equitable relief based upon the appointment of a trustee? Yes, Your Honor. And do you want this court to reverse the preliminary injunction and appoint your client with a trustee or not? Yes, Your Honor. Okay, what would that require for us to do that? Would that require a new trial, or would that... or to just enjoin the trial court's order, enter a new injunction? I mean, for us to do what you're asking would require a new injunction. And you've told me that you're not asking for an injunction. I understand what you mean, Your Honor. I do believe that that would be an injunction. You are correct. So when you started your argument saying that a preliminary injunction did not need to be granted in this case, certainly it seems to me that somebody needs an injunction if this corporation is going to operate. I agree, Your Honor. Okay, so where does your argument go from here now? So, Your Honor, in terms of what has happened thus far, there are two main issues that we had in terms of the injunctive relief granted, and that was that the injunctive relief is meant to preserve the status quo, and it in fact disrupted it. When you're attempting to preserve the status quo through injunctive relief, the case law states that you must return the parties to an uncontested status. And what Judge Feathers decided to do was decide the contest between Gregory and O'Toole, which is not what the purpose of injunctive relief is. It's our opinion that by expelling Joshua Toole from his primary employment as the gym's operation manager, Judge Feathers disrupted the status quo, and the case law in Postman is clear that it's improper to ask on an interim basis for the relief that is permanently requested by the parties in their claims and their counterclaims. And it's an abusive discretion to grant such injunctive relief. Both parties within their pleadings seek 100% control of legacy and seek an order from the court expelling their partner. The asked for injunctive relief is exactly that, only on an interim basis. So what Mr. Crowley was asking the court to do was, on an interim basis, decide the case until the case can go to trial. Mr. Larges, don't you have to show a substantial likelihood of success on the merits when you enter an injunction? I believe that's part of it, yes, Your Honor. So the parties have to at least put forth some evidence about who may succeed or not succeed in the case, correct? Yes, Your Honor. Okay. Go ahead. Also per the case law, there must be a pending, great, certain, and immediate threat. It's Mr. O'Toole's position that what was happening to legacy was, in fact, a loss of income due to the closure, the temporary closure, arguably due to Gregory's interference with O'Toole's running of the gym. The inconvenience to the second party must also be small in terms of injunctive relief. The court banned Josh from his primary source of employment and income and made it okay that he was receiving less than what his income should have been. In the original petition filed with the court, my predecessor alleged that Mr. Gregory had, in fact, cut his paycheck to less than what it should have been, and now it has been a year and a half since he has received his whole paycheck. What is your argument in this regard? Are you arguing that there is strictly a financial loss and that preliminary injunction does not lie where there is only a monetary loss? So, Your Honor, my argument was that Mr. Gregory had claimed that there was greater than a financial loss in order to receive the injunctive relief, and yet all of the arguments heard during the evidentiary portion was what type of financial loss the gym legacy stood to have if the doors were not reopened. Well, isn't it true that your client testified that he was basically the face of the gym, that he brought in the business? Yes, Your Honor. And so this was his reputation at stake, wasn't it? His reputation was absolutely at stake, yes, Your Honor. So isn't that more than just monetary loss when you're talking about somebody's ability to influence the coaches and the teams that come into the gym? Can you put a value on that? No, Your Honor, but in terms of this motion for injunctive relief, this was being alleged by Mr. Gregory, who has his own job as an accountant and was only a financial backer for Legacy Gym. He ran the financial parts of the business, but it was not his only form of employment. His reputation was not on the line for this motion for injunctive relief, so he would not have had that extra amount, Your Honor. But your argument when you talk about your client and the ability to bring in business and appear as the face of the gym supports a preliminary injunction for your client potentially. I would agree, Your Honor. But you have no pleadings on file that ask for such relief. Is that true? So as I said before, Your Honor, Marshall Rinder, who was the former attorney on the case, he had filed a motion for injunctive relief very early on, just after the petition was initially filed. But I don't even believe that that was at argument during the evidentiary and oral arguments. Right. You didn't adopt that petition in terms of arguing before the court, did you? No. Okay. Thank you. So just so I'm clear, what you're suggesting is that the injunction filed by the other side was unnecessary and no injunction should have been granted based on the fact that you believe it could have been money damages, could have solved the problem that made everyone whole. Yet there's an injunction that your predecessor filed that is still pending. Yes, Your Honor. And at some future point, you may take that up because your client is potentially going to suffer something other than money damages. Your Honor, I don't plan on taking that up. I believe that the case is ready to be set for trial. And honestly, I believe that this injunctive relief and the appeal has kind of sidetracked that. I honestly wish that Judge Gruthers had simply set it for an expedient trial when this evidentiary hearing had happened. We have a new judge assigned to this case. Is that correct? Yes, Judge Foster. And Judge Foster hasn't heard any of these arguments. I mean, obviously he has the benefit of the record. But, okay, go on. Yes, Your Honor. And just to speak on that a little bit, Judge Foster has been, has replaced Judge Gruthers. And there is a somewhat problem, there is a problem with that somewhat in the sense that Judge Foster has been receiving reports that were originally ordered by Judge Gruthers from Legacy and from Mr. Gregory, who is now in control of Legacy. And the problem with that is as the new judge, Judge Foster is receiving reports that are necessarily biased from Mr. Gregory on the condition of the gym and on how that gym is doing. And it puts my client at a distinct disadvantage at an eventual trial because all of the information that is going into the record currently through those reports is without his voice added to it. So there is likely to be a motion to refuse that judge? Potentially. I just wanted to state to the court that the changing of judges does not necessarily mean that my client still is not disadvantaged by the fact that injunctive relief has been granted, Your Honor. So what do you want at trial for your client? I would like to address the original petition filed by Mr. Linder on Mr. O'Toole's behalf. I would like to address all of the... No, but tell me what you want. I know what you want to address, but what relief do you want? Mr. O'Toole would like 100% of Legacy. And the ability to take over the loan that Legacy has taken out and the ability to figure out what damages are to the two different parties and have the two of them go their separate ways. Okay, well, how do you get 100% if you only own 50? How can a court award you 100% if you only own 50%? And the problem with that, Your Honor, is one of contract law. The problem with the original operating agreement is that it only anticipated the company being dissolved if there was 100% agreement on how to dissolve it. And these two parties cannot come to a 100% agreement on anything, Your Honor. Right, so you're going to ask for a judicial dissolution under the LLC Act? Yes, Your Honor. Okay, and so you're seeking... Does your client want to operate the gym at some point? Yes, Your Honor. Okay. Thank you. Okay, it appears you're out of time at this point, but you'll get time in rebuttal. Thank you, Your Honor. We'll hear from Mr. Cranley next. Good morning, Justices. Counsel, may it please the Court. I'm Jack Cranley. I'm here on behalf of Mr. Raymond Gregory individually and derivatively on behalf of the Lenzy Cheer LLC, of which Mr. Gregory is a 50% owner. But for the record, I'm also John Cranley, just in case there was any confusion. I'm not thinking of you two different people. You're just using the same name sometimes. Well, it's in Patrick's name now, John and Jack. All right, thank you, Counsel. Thank you. Justices, I know that we are all well-versed in the elements required for a preliminary injunction, and that in order to obtain the preliminary injunction, a party has to make a prima facie case that there is, one, a clearly ascertained right that is in need of protection. Secondly, that an irreparable injury will occur if the Court does not grant the injunctive relief sought. Third, that there's no other adequate remedy at law. And fourth, and finally, that there's a likelihood of success on the merits. And we cited Mohanty from our Illinois Supreme Court, although that litany of elements is common in many, many cases. Let me stop you for one second and just jump to the crux of a lot of the questions that the panel had for your opponent. What is it that your client wants out of the injunction? I mean, obviously, the injunction was granted. That's what he wanted. What is the ultimate outcome that your client is seeking? Well, thank you, Justice. Ultimately, we're looking for judicial dissolution. Ultimately, it would appear that one party would have to buy the other one out, or that the business would have to be sold. Mr. Gregory is in a position to do that, and the reason that he was introduced to the business in the first place was because Mr. O'Toole is not. Does that satisfy your question, Your Honor? Yes. After three arduous days of hearings, the trial court found that Mr. Gregory had made a prima facie case and that he'd met the burden of proof to support the relief of a preliminary injunction. The court entered its order in a subsequent order consistent with the evidence,  As I look back in preparation of these briefs, it seemed abundantly clear to me that Mr. O'Toole's testimony on the stand in response to my question as to what his understanding was the effect his action in closing the business was having on the gym, he responded it is, quote, destroying the gym, end quote. Judge Carruthers noted that Mr. O'Toole closed that gym on his own, without the request of the court, that it was unjustified. In essence, that testimony summed up everything that we needed to know and everything that Judge Carruthers needed to know in order to enter the preliminary injunction. Mr. Cranley, I think Mr. O'Toole testified that he closed it due to safety concerns with the children because your client cut him off from all access to communication with clients. You think that's a good business practice? Do you think it is a good business practice for Mr. Gregory to cut off the access? Yes. It didn't happen. It didn't happen. It did not happen, Justice. Explain to me what did happen. We're not certain what he had up his sleeve. Well, no. Excuse me. Excuse me. I want to know what testimony is in the record that says Mr. Gregory did not cut off Mr. O'Toole from access to the gym parents. Okay. Thank you, and I will address that directly. Mr. Gregory testified and presented documentary evidence that Mr. O'Toole used the actual system that he claimed to be cut off to notify all of the customers that the business was being closed. In other words, he used the exact system that he claimed that he was cut off of. So who was working with him? As I understand it, the system that he had limited access to where he could reach the parents, but there was a better system that he was not given access to. Is my understanding incorrect? Your Honor, we assert very adamantly that your understanding is incorrect, and it's as a result of Mr. O'Toole's misleading testimony. He was granted access to the iClass system at the outset, and we presented documentary evidence that showed that not once over the course of his participation in this business did he ever access that system. He directed a couple of his cohorts to access it, and they regularly ran the business through that system. The safety issue was— Let me— Please. Did you say that he didn't access, what did you call it, the i— iClass. iClass. It's an integrated system that handles all— It sends out mass texts and emails and— Well, that's just one function of it, and it's not even the primary function. Okay. It's for scheduling of classes, scheduling of coaches, to keep track of finances. It's an overall system to run the business, and optimally, everyone would use it so that we have a consistent set of data to work with to manage the business. You said that Mr. O'Toole did not take advantage of using that system. That's correct. He provided, or he directed cohorts, I'm assuming, of his employees. Yes, Your Honor. His employees to use the system. That's correct. And that he ran the business using that system overall? Not exactly. Was it not what you just said? Well, the system was used by his— His employees. His employees. Okay. So how is that not him, if he's the manager of the business, asking someone he's delegated that authority to to use the system? He did use the system. His employees. And they continued to have access to the system up through the closure and afterwards. Okay. So that was never taken away from him? That's correct. I.e., through or his employees? That is correct, Your Honor. Okay. I'm assuming that there is a password, somehow, security code password, something of that nature that's necessary to access that system? I'm not certain of that specific feature of it, but we do have an audit log that was submitted as evidence demonstrating who accessed the system when, and it does show that one of his new hire employees to run the gym that had never been discussed with Mr. Gregory actually sent out the e-mails notifying all of the customers of the closure via the exact system that they later claimed they did not have access to. So to your knowledge, just so that I'm clear, and I don't know how important this is right now, but just so that I'm clear, your understanding is your client never changed a password or a security code or somehow prevented access to this system at any time during this litigation? That is correct. Okay. In fact, the opposite is true. Okay. Any further on that, Justice Gates? The I-Class system had credentials that needed to be signed into, correct? Yes. And I'm not certain of the details of how the password and username worked, but they certainly had credentials. And Misty Malone is the person who was designated as the employee for Mr. O'Toole, as I understand it, to send out and schedule and things of that nature. Until she quit and then he hired a Ms. Lauren Gersak. Right. And the quitting of Misty Malone occurred almost within days of the closure of the gym. Is that true? We have evidence that she actually announced it over a month prior to that. We simply weren't made aware of this. And then the new person was hired again without any information of Mr. Gregory. Didn't the new person, Laura, use Misty's credentials to send out the emails? That's what we're to understand, yes. So Mr. O'Toole never really used the I-Class system. He was more of the hands-on coach, if you will, in the classes and working with the kids at the gym. We would have probably not been here today if that was true. He actually stopped coaching classes many months before and he engaged in the practice primarily of just giving private lessons and taking the money and keeping it to himself. So we wish that what you stated was true, but unfortunately it's not. And that will be something that will be considered in full at the time. That was his testimony, isn't it? Whose testimony? Mr. O'Toole testified that he was more of the hands-on coach who worked with the kids and allowed Misty Malone to access the I-Class system to schedule classes for the other coaches and send out emails. Yes, that was his testimony. That was the effect of his testimony. I know you dispute that, but that was his testimony. Yes, I do. Okay. And so Justice Barberis asked you, did Mr. Gregory ever change the credentials to the I-Class system to prevent Misty Malone from using it? No. So the same credentials would have been allowed to be used by Laura to send out the emails even after closure of the gym? They were not supposed to be. Clearly, you might know someone else's password, but you're not permitted to use it. Lauren was hired surreptitiously, without notice, to Mr. Gregory. And so in that time frame from the end of August, when we initially filed for relief on discovery,  so we're not quite sure what they did during that time, but some of the documents that we have show that they did use the system and they sent out that notice of closure. Mr. Cranley, did your client have another job during the day? He always has, Your Honor. He's a CPA and he's an accountant. He works for a private company. He's always had other employment and he was recruited because he had some financial wherewithal to participate in this business. And his family, his wife and children, they love cheer, and so it was an attractive opportunity to him. And he tried to stay active in managing it from a financial standpoint. And he manages the business today. And on a day-to-day basis, did he have any experience with coaching and hiring coaches other than his family? No. I mean, did he have any reputation, for example, that would have attracted coaches to the company, the cheer gymnasium, other than his family? No, he didn't. He was not a gymnast himself. But those coaches have all returned to the business and they have a reputation with the customers. So, you know, I mean, Elon Musk doesn't fly the SpaceX ship to the moon, but he's the CEO. And so Mr. Gregory runs businesses and he knows how to do that and to hire people and to keep them on, they're doing it successfully now as is regularly reported to the court. So let me ask this. With regard to Mr. Gregory's role prior to this disagreement, did he have control over hiring and firing of employees or was that left to the day-to-day operation that Mr. O'Toole, that was part of his responsibility? The operating agreement said that decisions on hiring were to be made by both members. There was a schism in this case, there's no question. The parties did not effectively communicate. And therefore, hiring, if there were such a term to be applied to it, and such were handled by Mr. O'Toole. And we ended up with the reports show that there was no controls of staffing and the expenditures were just completely out of control. And that was one of the reasons that, you know, there was a schism. So Mr. O'Toole, up to the point that this disagreement between the parties, the partners happened, Mr. O'Toole had always been left to the hiring and firing? Not left to. He assumed it and refused to communicate any of those things. Mr. Gregory, was that an issue of conflict prior to this for Mr. Gregory? Yes, absolutely. Almost since the business opened. Okay. The business was only open three months, right? Before the attorneys lawyered up, excuse me, before the parties lawyered up and tried to come to some agreements that they still today, obviously, have not been able to resolve. Okay. All right. I know we've had a lot of questions for you. If you want another minute of just finishing your thoughts and summarizing your argument for us. I certainly appreciate it. If you don't need it, you don't have to have it. I'm not going to talk about this. I'll keep it short because if this injunction was not issued, the business would be shut down. There would be no customers. There would be no revenue. The only thing remaining would be the debt of the entity, which is secured by Mr. Gregory and his personal home. In preserving the status quo, this injunction has allowed the business to resume operations and requires Mr. Gregory to report regularly to the court. The business continues to operate as a going concern. The injunction preserves the entity. It is, again, achieving profitability, and this allows the court to have something to deal with to ultimately determine what the parties may or may not be entitled to. We implore the court not to disrupt the preliminary injunction, as to do so would very likely render this business incapable of proceeding. You know, it's really interesting because they talked about an expeditious trial. This judge had set this matter for trial on November 29th through December 2nd, four months ago, and it was continued over my objection because we wanted to have a resolution, but here we are nearly four months later arguing the issue of the injunction. Your Honor, Your Justices, I thank you for your time, and I'll be available. Any further questions before I excuse myself? I have one additional question. What's your response to your comments at that point, Trustee? The Trustee's suggestion was made, you know, at the last minute. Our understanding is that this person was not necessarily somewhat qualified to act as a trustee. He was Mr. O'Toole's personal tax preparer, and the resume that we received gave us no confidence that the individual had any competency in the court. At the trial level, we did not see that the trustee was a viable option, given the ongoing issues between the parties. I might have one other question for you. Page 3 of the appellant's brief says that, as found in Postma, the status quo that the trial court should have sought to preserve was not the status quo of the business, in other words, keeping it open, keeping it profitable, or so forth and so on, but rather the status quo of the parties themselves. Is that your understanding of Postma? I mean, is the status quo on this injunction should have been to have the two partners remain in their positions, or is it to push one aside and let the business proceed? That's what I intended to primarily address, because the issue of the status quo really here is a little bit of a distraction, because the parties and the entity are virtually inseparable. There's only two of them. And this injunction preserves a benefit for everyone involved. And, in fact, Judge Carruthers indicated that preserving the business actually benefits Mr. O'Toole. Because there's a business to be divided now. And so, again, in Judge Carruthers' opinion, I think it's clear that the injunction benefits everyone individually and this entity, not to mention the third parties that are involved, the employees and the customers and such. So PADMA, I think, indicates that, that sometimes the status quo is not to put something back, but to put something in place to preserve something so that we can go forward. And I'm not sure if it's Kabersmeyer that I cited on that in my brief, but I certainly am prepared to supplement. I know there's a significant record. I'm willing to supplement any specific citations or anything that I might have overlooked. Is that satisfactory, Your Honor? Justice. Thank you. Justice Case, do you have any further questions? No, and I don't need any further supplementation. Thank you. Okay. Thank you. All right, thank you. Your Honor, just three items really quickly. The first thing I'd like to address is the trustee. When we suggested a trustee to Judge Carruthers, during oral arguments, he asked who the trustee would need to be. We had suggested a local accountant who had acted as trustee on other matters before the court. It was not necessarily to his personal accountant, but rather somebody who was well-respected in the community. We also made it known to Judge Carruthers that we believed that both parties would need to agree on the trustee before that trustee could be implemented. I think it's important that both parties would have needed to work together with the trustee, so it had to be somebody that they both trusted rather than somebody that would be possibly biased to one side. In terms of the I-Class system, did you say that they both had to agree on the trustee? I believe so, Your Honor. That never would have happened, given the facts of this case. It would have been impossible. Either that or the judge would have decided on somebody who would have been non-biased to either person. Your Honor. All right. In terms of the I-Class system that was addressed, I think it is clearly in the record, or at least through the testimony of both Lauren and Josh, that there were different levels to the I-Class system. I believe there were three different levels to the I-Class system. Mr. Gregory had the most access. Lauren and Misty Malone had a lower form of access. And then there was the form of access that coaches and other employees had. And originally, Misty Malone had that access, was able to engage with the system, which was very exciting. You said that she had that level of access, but you named three different levels. What level did she have? So she had a medium level of access. If you're wrong, I'm assuming the top level would have been the financials of the company. The second level would have been the communication from the company to personnel. And clients, and the bottom level was something less than that? Somewhat, Your Honor. I don't know that that's completely it, but the second level did have access to communications. Yes, Your Honor. But it didn't have access to the financials? No, no. Okay. There is more to it than that, but a lot of what was said about the I-Class system was that it was used to communicate with parents. And so when Mr. Gregory limited the access to that system, it was limiting their ability to use that, to contact the parents, and to answer questions. How did he limit it? You heard the questions we asked Mr. Cranley with regard to was there a password, a security code, credentials that needed to be updated? How did he limit your client and other employees that your client utilized from using the system? So from what I understand is he could manipulate the system internally in order to limit the access of certain people. I believe that originally Warren Jurczak and Misty Malone could not only send out blast messages to all the parents, those parents could also message them back, and then they could send a responsive message to those parents. And once Mr. Gregory limited access, they were not able to receive the responsive messages from the parents, and they were also not able to respond. Okay, so in other words, what you're suggesting is that this system has a list of people who have access to different levels of the system. Yes. And Mr. Gregory being at the top level, was Mr. O'Toole originally at the top level of access? No, he was never given that much access. So he never had the access to the financials. With regard to the list of people that had access to the system, Mr. Gregory being at the very top, could go in and mark off who didn't have access or limit their use or access to certain levels of the system as he saw fit. That is how I understand it, Your Honor. And was there proof that he had done that, that he had went and checked off or limited people? I believe that is in the record from the testimony of Warren and Josh, Your Honor. Their testimony was just that they didn't have access to the system. And they did not have access to the crucial parts of the system. And it wasn't just the I-Class system where they were limited. Mr. Gregory also got their access banned to the Facebook page, to the website itself. There were many forms of communication that they normally used through Facebook with the parents, and they were denied access to that. With this lack of access and lack of ability to run the gym, they closed the gym, Your Honor. In terms of one argument that I didn't get to before, it is Mr. O'Toole's position that contested facts were preemptively decided by the court, and that the merits of the case were preemptively decided when the court granted Mr. Gregory's motion. Because it was temporary relief of what was asked for on a permanent basis, that the deciding of facts for that temporary relief, they were the merits of the case. Many of the facts that were decided by Judge Carruthers were contested and controverted, and should not have been decided at the injunction stage. And as I said, many of them were present in initial pleadings and counterclaims filed by both of the parties. So your time is up. And I think from going forward, anytime I'm presiding, we might as well just turn the clock off. I'm going to go beyond that, depending on what I feel. But just go ahead and close up your arguments for us, okay? Because we've got you braced. We've heard the arguments. So I'll give you another few seconds to wrap it up. Thank you, Your Honor. We just believe that the injunctive relief order from Judge Carruthers should be overturned, that the parties and the status quo should be preserved, and that the parties should be made equal again, such that a trial could be had where they are on the same level, rather than one party being advantaged over the other going into trial. And with that, Your Honor, I'll stop. Okay. Any other questions? Justice Case? No, thank you. Okay. Thank you very much. Thank you, Your Honor. Thank you both for your briefs and for your arguments here today. The court will take the matter under consideration and issue its ruling in due course.